**REVISED**

United States Court of Appeals,

Fifth Circuit.

No. 96-50916.

Marie PFAU, Plaintiff-Appellant,

v.

William REED, In His Official Capacity as Director of the Defense Contract Audit Agency, Defendant-Appellee.

Oct. 27, 1997.

Appeal from the United States District Court for the Western District of Texas.

Before KING, DUHÉ and WIENER, Circuit Judges.

KING, Circuit Judge:

Plaintiff-appellant Marie Pfau appeals the district court's dismissal of her claims of intentional infliction of emotional distress and grant of summary judgment in favor of defendant-appellee William Reed in his official capacity as Director of the Defense Contract Audit Agency on her claims of sexual harassment. We affirm.

## I. BACKGROUND

This case arises out of the alleged sexual harassment of plaintiff-appellant Marie Pfau while an employee of the Defense Contract Audit Agency ("DCAA") by Pete Gonzales, Pfau's first-line supervisor during a portion of her tenure with the DCAA. We are called upon to evaluate the propriety of the district court's dismissal of Pfau's claims of intentional infliction of emotional distress and grant of summary judgment in favor of

1

defendant-appellee William Reed in his official capacity as director of the DCAA as to her claims of sexual harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17.

## A. Facts[1]

Pfau worked for the DCAA for ten years prior to her involuntary termination on November 9, 1993. In October of 1992, she transferred into the DCAA audit team supervised by Gonzales. Pfau alleges that Gonzales immediately began making "lewd and suggestive comments" to her and "request[ing] sexually provocative behavior from" her. Pfau alleges that Gonzales requested that she take him on a trip with her and made sexual advances that she rejected. Pfau contends that, upon discovering her vacation plans for December 1992, Gonzales began asking Pfau to allow him to accompany her on her trip and to pay his way. Pfau also alleges that Gonzales asked her for money on several other occasions.

Pfau claims that, during her first month in Gonzales's audit group, Gonzales called and insisted on visiting Pfau at her apartment. According to Pfau, he came to her apartment and insisted that they become involved. Pfau avers that she refused to

---

[1]The recitation of facts in this subpart is limited to the factual allegations of Pfau's complaint. Applicable summary judgment evidence is discussed in Part II.B, *infra.*

Different versions of Pfau's complaint were pending before the district court at the time that it dismissed her claim of intentional infliction of emotional distress and at the time that it entered summary judgment against her on her sexual harassment claims. However, the factual allegations in each version are similar in all material respects.

2

comply with Gonzales's demands.

Pfau filed charges of sexual harassment and discrimination against Gonzales, along with retaliation and reprisal charges. Pfau contends that Gonzales engaged in acts of retaliation for her filing sexual harassment charges against him, including "sabotaged work assignments to prevent completion, hindering performance, withdrawing assignments, invalidating [Pfau's] audit findings, inappropriately discussing audit findings with contractor personnel, and subjecting her to harsh, inordinate, and unwarranted criticism of work assignments." Pfau alleges that Gonzales denied her the training necessary to successfully advance to higher level assignments. She also contends that Gonzales began to assign her to auditing projects that did not comport with her level of experience, placed her on a performance improvement plan, and ultimately terminated her for filing sexual harassment charges against him. Pfau further claims that Gonzales denied her request for sick leave on April 15, 1993.

Pfau avers that, during the investigation of her sexual harassment charges against Gonzales, DCAA counselors pressured her to withdraw the charges that she filed against Gonzales "in return for a transfer or promises that her impending termination would be halted." Pfau declined to withdraw her complaint. Pfau also alleges that DCAA counselors failed to document her complaints and only acknowledged them after she complained to DCAA management on numerous occasions. Pfau contends that she was ultimately compelled to contact the DCAA's central office equal employment

3

opportunity personnel in order to procure proper documentation of her claims. She claims that the DCAA never conducted an impartial evaluation of her job performance and charges of sexual harassment prior to her termination.

## B. Procedure

On March 7, 1995, Pfau filed her original complaint, naming as defendants Reed in his official capacity as Director of the DCAA, the United States Department of Defense, William J. Perry in his official capacity as Secretary of the Defense, and Pete Gonzales, both in his individual and official capacities (collectively "defendants"). The complaint alleged causes of action for sexual harassment under Title VII and the Civil Rights Act of 1991 and a claim of intentional infliction of emotional distress. On June 19, 1995, Pfau filed her first amended complaint.

On July 24, 1995, the defendants filed a motion seeking dismissal of all claims against all defendants except the Secretary of Defense and dismissal of Pfau's claim of intentional infliction of emotional distress. The court initially denied the motion, but upon a motion for reconsideration, reversed its earlier ruling in an October 24, 1995 order. It dismissed Pfau's claim of intentional infliction of emotional distress with prejudice and held that the Director of the DCAA was the only proper party defendant with respect to Pfau's Title VII claims.

On October 27, 1995, Pfau filed her second amended complaint, which added the United States as a party defendant and asserted a claim of intentional infliction of emotional distress against it

4

under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680. Pfau's second amended complaint also retained her cause of action for intentional infliction of emotional distress against Gonzales in his individual and official capacities.

The DCAA filed a motion to correct the caption of the case and to dismiss Pfau's second amended complaint. The court granted the motion and ordered Pfau to correct her complaint so that it complied with the court's October 24, 1994 order. Accordingly, on January 18, 1996, Pfau filed her third amended complaint, which named only the Director of the DCAA in his official capacity as a defendant and dropped her claim of intentional infliction of emotional distress.

On April 19, 1996, the DCAA filed a motion for dismissal of Pfau's sexual harassment claims or, in the alternative, partial summary judgment. On August 16, 1996, the district court rendered summary judgment in favor of the DCAA on Pfau's sexual harassment claims. Pfau filed a timely notice of appeal.

## II. DISCUSSION

Pfau argues that the district court erred in (1) dismissing her claims of intentional infliction of emotional distress against the DCAA and Gonzales in his individual capacity and (2) granting summary judgment in favor of the DCAA on Pfau's sexual harassment claims. We analyze the propriety of the court's order of dismissal and grant of summary judgment in turn.

### A. Dismissal

#### 1. *Standard of Review*

5

We review a dismissal on the pleadings de novo, applying the same standard as the district court. *See Truman v. United States,* 26 F.3d 592, 593 (5th Cir.1994). "Accordingly, we accept the well-pleaded allegations in the complaint as true, and we construe those allegations in the light most favorable to the plaintiff." *Id.* at 594. We will therefore uphold the dismissal of Pfau's intentional infliction of emotional distress claims "only if it appears that no relief could be granted under any set of facts that could be proven consistent with the allegations." *Rubinstein v. Collins,* 20 F.3d 160, 166 (5th Cir.1994) (internal quotation marks omitted).

## 2. *Analysis*

The district court dismissed Pfau's intentional infliction of emotional distress claims on the ground that they are preempted by the Civil Service Reform Act ("CSRA"), Pub.L. No. 95-454, 92 Stat. 1111 (1978) (codified as amended in scattered sections of 5 U.S.C.), and Title VII. We do not address the preemptory effect of the CSRA because we conclude that Pfau's claims are preempted by Title VII.

Pfau acknowledges that Title VII provides the "exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination." *Brown v. General Servs. Admin.,* 425 U.S. 820, 829, 96 S.Ct. 1961, 1966, 48 L.Ed.2d 402 (1976). We have interpreted the Supreme Court's mandate in *Brown* to mean that, when a complainant against a federal employer relies on the same facts to establish a Title VII claim and a non-Title

6

VII claim, the non-Title VII claim is "not sufficiently distinct to avoid" preemption. *Rowe v. Sullivan,* 967 F.2d 186, 189 (5th Cir.1992); *see also Jackson v. Widnall,* 99 F.3d 710, 716 (5th Cir.1996).

Pfau advances four arguments as to why her claims of intentional infliction of emotional distress are nonetheless not preempted by Title VII. First, Pfau argues that the elements that a plaintiff must prove in order to establish a claim of *quid pro quo* or hostile environment sexual harassment under Title VII are different from the elements necessary to establish a claim of intentional infliction of emotional distress. Second, Pfau urges that the purposes served by Title VII and the cause of action for intentional infliction of emotional distress are distinct; the former serves to "strike at the entire spectrum of disparate treatment of men and women in employment," *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) (internal quotation marks omitted), whereas the latter serves to protect individuals from injuries to their psyches. *See Twyman v. Twyman,* 855 S.W.2d 619, 621-22 (Tex.1993). Third, Pfau contends that she has advanced types and instances of conduct in support of her intentional infliction of emotional distress claims different from those she has advanced in support of her Title VII claims. Fourth, Pfau contends that her claim against the DCAA is cognizable under the FTCA, and therefore cannot be preempted by Title VII. None of these arguments warrants the conclusion advanced by Pfau regarding the scope of Title VII preemption.

7

First, the fact that the legal elements a plaintiff must establish in order to state a claim of sexual harassment are different from those necessary to state a claim for intentional infliction of emotional distress does not preclude preemption because the same facts may establish different legal elements. For example, a claimant seeking to establish a claim of hostile environment discrimination must prove, among other things, that the claimant suffered unwelcome, harassing sexual conduct. *See Jones v. Flagship Int'l,* 793 F.2d 714, 719-20 (5th Cir.1986). A claimant seeking to establish a claim for intentional infliction of emotional distress must prove, among other things, that the claimant was subject to extreme and outrageous conduct. *See Twyman,* 855 S.W.2d at 621. While these are distinct legal elements, the same facts may nonetheless establish both of them in many circumstances. By establishing the occurrence of sexually harassing conduct, a plaintiff may at the same time establish the existence of extreme and outrageous conduct.

Second, the fact that private actions under Title VII and the common law tort of intentional infliction of emotional distress serve different purposes cannot dictate our decision as to preemption. As demonstrated above, sexually harassing conduct may also be extreme and outrageous conduct, and vice versa. When the same set of facts supports a Title VII claim and a non-Title VII claim against a federal employer, Title VII preempts the non-Title VII claim. *See Jackson,* 99 F.3d at 716; *Rowe,* 967 F.2d at 189. Under the controlling case law in this circuit, the existence of

8

multiple reasons for preventing a particular type of conduct is therefore irrelevant to the determination of preemption.

Third, Pfau's contention that the factual allegations of her first amended complaint "cannot reasonably be read as conduct constituting *only* employment-related sexual harassment" likewise does not establish the absence of Title VII preemption. The mere fact that some of the alleged harassment occurred away from the office and after business hours does not support Pfau's contention that the district court "misconstrued which factual allegations supported which claims." All of the factual allegations in Pfau's complaint support her claim under Title VII.

In *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court concluded that a plaintiff who suffered sexual harassment both during and after office hours had stated a claim under Title VII. *Id.* at 66-67, 106 S.Ct. at 2405-06. The fact that the Court discussed at length the plaintiff's allegations of sexual harassment outside the office setting indicates that those allegations formed part of the basis for the plaintiff's Title VII claim. *See id.* at 60-61, 106 S.Ct. at 2402-03. The Court stated that

> "[s]exual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality. Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets."

*Id.* at 67, 106 S.Ct. at 2405 (quoting *Henson v. Dundee,* 682 F.2d 897, 902 (11th Cir.1982)). Clearly, the "gauntlet of sexual abuse"

9

that an employee is required to run need not be confined to working hours in order to affect a " "term, condition, or privilege' of employment within the meaning of Title VII." *Id.* Thus, we reject Pfau's contention that her allegations that Gonzales called her at home and demanded that she take him on vacation with her are not allegations that support her Title VII claims.  Pfau cannot avoid Title VII preemption by picking and choosing which of her factual allegations she wishes to allocate to her Title VII claims and to her independent torts claims.[2]

Fourth, Pfau's contention that her intentional infliction of emotional distress claim against the DCAA is not preempted by Title VII because it is otherwise cognizable under the FTCA lacks merit. Assuming that the claim is not barred by the FTCA, this fact plainly does not preclude Title VII preemption.  In *Brown,* the Supreme Court observed that "a precisely drawn, detailed statute

---

[2]Pfau urges us to adopt the position on Title VII preemption taken by the Ninth Circuit in *Brock v. United States,* 64 F.3d 1421 (9th Cir.1995).  In that case, the plaintiff, a former employee of the Forest Service, brought suit under the FTCA against the United States for negligent supervision based on her being raped and otherwise sexually harassed by her supervisor. *See id.* at 1422. The court concluded that, while the plaintiff's rape clearly constituted a form of sexual discrimination, it was also "more than sexual discrimination," and therefore justified the plaintiff's assertion of non-Title VII claims against the government. *Id.* at 1423.

We decline to adopt the position taken by the Ninth Circuit in *Brock* because it is inconsistent with the jurisprudence of this circuit.  So long as the factual predicate of a claimant's non-Title VII claims is the same as the factual predicate for the claimant's Title VII claims against a federal agency, we are bound to conclude that Title VII preempts the non-Title VII claims. *See Jackson,* 99 F.3d at 716;  *Rowe,* 967 F.2d at 189.

10

pre-empts more general remedies." *Brown,* 425 U.S. at 834, 96 S.Ct. at 1968.  Because Congress has manifested a clear intent that Title VII serve as the "exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination," *id.* at 829, 96 S.Ct. at 1966, Pfau cannot seek relief for such discrimination through the more general remedy afforded by the FTCA.

Pfau also challenges the district court's dismissal of her intentional infliction of emotional distress claim against Gonzales in his individual capacity.  However, the district court's dismissal of Pfau's claim against Gonzales in his individual capacity was proper for the same reasons that the court's dismissal of Pfau's claim against the DCAA was proper.  Title VII's preemptive effect as to claims against individual supervisors is coextensive with its preemptive effect as to claims against federal agencies.  *See Newbold v. United States Postal Serv.,* 614 F.2d 46, 47 (5th Cir.1980); *Cazalas v. United States Dep't of Justice,* 569 F.Supp. 213, 225-27 (E.D.La.1983), *aff'd,* 731 F.2d 280 (5th Cir.1984).

## B. Summary Judgment

### 1. *Standard of Review*

"We review a grant of summary judgment de novo, applying the same criteria used by the district court in the first instance." *Texas Manufactured Housing Ass'n v. City of Nederland,* 101 F.3d 1095, 1099 (5th Cir.1996), *cert. denied,* --- U.S. ----, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997).  Summary judgment is proper "if the

11

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554-55, 91 L.Ed.2d 265 (1986).

## 2. *Analysis*

The district court entered summary judgment in favor of the DCAA on Pfau's claims of quid pro quo and hostile environment sexual harassment.  The court observed that Pfau's claim of quid pro quo sexual harassment required proof of the following elements:

(1) "that she is a member of a protected group;"

(2) "that she was subject to unwelcome sexual harassment;"

(3) "that the complained-of harassment was based upon sex;"

(4) "that her reaction to the harassment affected tangible aspects of the terms and conditions of her employment, with her acceptance or rejection of the harassment being either an express or implied condition to receipt of a benefit to or the cause of a tangible adverse effect on the terms or conditions of her employment;" and

(5) "*respondeat superior.*"

*Ellert v. University of Texas,* 52 F.3d 543, 545 (5th Cir.1995). The court further observed that Pfau's claim of hostile environment sexual harassment required proof of the following elements:

"(1) [t]he employee belongs to a protected group ...;

(2) [t]he employee was subject to unwelcome sexual harassment, i.e. sexual advances, requests for sexual favors, and other verbal and physical conduct of a sexual nature that is unwelcome in the sense that it is unsolicited or unincited and is undesirable or offensive to the employee;

(3) [t]he harassment complained of was based upon sex ...;

12

(4) [t]he harassment complained of affected a "term, condition or privilege of employment,' i.e., the sexual harassment must be sufficiently severe as to alter the conditions of employment and create an abusive working environment;

(5) [r]espondeat superior, i.e., that the employer knew or should have known of the harassment in question and failed to take prompt remedial action."

*Waltman v. International Paper Co.,* 875 F.2d 468, 477 (5th Cir.1989) (brackets and ellipses in original) (quoting *Jones v. Flagship Int'l,* 793 F.2d 714, 719-20 (5th Cir.1986)).

The district court concluded that no genuine issue of material fact existed as to the *respondeat superior* element of either Pfau's quid pro quo or hostile environment sexual harassment claims.[3]

Pfau challenges the district court's entry of summary judgment against her on her sexual harassment claims on the ground that a genuine issue of material fact exists as to the *respondeat superior* elements of both her quid pro quo and hostile environment sexual harassment claims. Pfau advances two theories in support of this proposition. First, she argues that a genuine issue of material fact exists as to whether Gonzales was her "employer" within the meaning of Title VII's definition of that term. She contends that, if Gonzales was her employer, then the DCAA is strictly liable under Title VII for Gonzales's harassment. Second,

---

[3]Use of the term "*respondeat superior* " as an element in claims of quid pro quo and hostile environment sexual harassment may be a bit misleading to the extent that the term traditionally implies strict employer liability. *See* BARBARA LINDEMANN & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 760-61 n. 85 (3d ed.1996). In the context of quid pro quo and hostile environment sexual harassment prima facie claims, the term means more generally a legal basis for employer responsibility. *See id.*

she argues that, even if Gonzales is not her employer or an agent thereof, a genuine issue of material fact exists as to whether the DCAA knew or should have known of his harassment of Pfau and other DCAA employees and failed to take prompt remedial action. We find each of these arguments to be without merit.[4]

### a. *Gonzales as "Employer"*

Title VII prohibits employers from, among other things, "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or

---

[4]In contending that genuine issues of material fact precluded the district court's entry of summary judgment against her, Pfau relies to a large extent on excerpts from her second amended affidavit, which she submitted to the district court along with her motion for reconsideration of the court's order granting summary judgment. The DCAA contends that, because this affidavit was not before the district court when it rendered summary judgment for the DCAA, we cannot consider it on appeal.

The DCAA correctly observes that "materials not presented to the district court for consideration of a motion for summary judgment are never properly before the reviewing court on appeal from the judgment granting the motion." *Munoz v. International Alliance of Theatrical Stage Employees,* 563 F.2d 205, 209 (5th Cir.1977). However, "[i]f [a] party seeking reconsideration submits additional materials, the trial court may consider those materials in its discretion. If the lower court does consider the materials and still grants summary judgment to the moving party, the appellate court may review all of the materials *de novo." Fields v. City of S. Houston,* 922 F.2d 1183, 1188 (5th Cir.1991) (citations omitted).

The district court's order denying Pfau's motion for reconsideration states that "[t]he Court has carefully reviewed the foregoing [motion and affidavits] and finds that these additional affidavits do not in any way merit a reversal of the Court's grant of Defendant's Motion for Partial Summary Judgment." Because the district court obviously considered the additional affidavits submitted by Pfau and still concluded that summary judgment was properly granted, we may review these affidavits as well.

14

national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, *and any agent of such a person* ...." 42 U.S.C. § 2000e(b) (emphasis added). While the plain language of the above provisions facially appears to provide a basis for rendering agents of an employer personally liable for their discriminatory acts, this circuit has interpreted Title VII's definition of employer as merely importing common law agency principles of *respondeat superior* liability. *See Grant v. Lone Star Co.,* 21 F.3d 649, 652 (5th Cir.1994) ("[T]he purpose of the "agent' provision in § 2000e(b) was to incorporate *respondeat superior* liability into title VII."). Thus, the actions of one who constitutes an agent of an employer may be considered the actions of the employer for purposes of imposing Title VII liability on the employer.

Pfau contends that Gonzales was the DCAA's agent within the meaning of Title VII, and that his knowledge of his own sexually harassing conduct is imputed to the DCAA, rendering it strictly liable under Title VII. We reject this contention.

In *Meritor,* the Supreme Court rejected the notion that supervisory personnel are agents per se within the meaning of Title VII's definition of employer, and thus rejected the notion that employers are strictly liable for the sexually harassing conduct of their supervisors in all circumstances. *See Meritor,* 477 U.S. at 72, 106 S.Ct. at 2407-08. The Court "decline[d] ... to issue a

15

definitive rule on employer liability" for the actions of supervisory personnel, but indicated that common law agency principles may be useful in determining the situations in which a supervisor constitutes an employer's agent for Title VII purposes. *See id.* at 72, 106 S.Ct. at 2407-08.

Pfau contends that *Meritor,* along with cases in this circuit and others interpreting it, establishes that Gonzales was the DCAA's agent within the meaning of Title VII's definition of employer, and thus that his sexually harassing conduct is directly attributable to the DCAA.[5] We disagree. The summary judgment

---

[5]To date, cases in this circuit that have broached the issue of whether a supervisor is an agent of an employer for purposes of Title VII have not expressly differentiated between the existence of an agency relationship for purposes of a quid pro quo sexual harassment claim and the existence of such a relationship for purposes of a hostile environment sexual harassment claim. To the extent that a determination that a supervisory employee is the employer's agent provides a basis for holding the employer strictly liable for the supervisor's harassing conduct, it is possible that a supervisor may be the employer's agent for purposes of supervisory conduct that constitutes quid pro quo sexual harassment, but not for purposes of supervisory conduct that constitutes hostile environment sexual harassment. *See* LINDEMANN & GROSSMAN, *supra,* at 775, 812 (observing that "[m]ost courts have found employers automatically liable for the actions of their supervisory personnel in quid pro quo cases," but that "[h]ostile environment sexual harassment normally does not trigger respondeat superior liability because sexual harassment rarely, if ever, is among the official duties of a supervisor"). In *Henson v. City of Dundee,* 682 F.2d 897 (11th Cir.1982), the case that set forth the frameworks for prima facie claims of quid pro quo and hostile environment sexual harassment adopted in this circuit, *see Jones,* 793 F.2d at 719-20, 721-22, the Eleventh Circuit explained the distinction regarding the propriety of strict employer liability for supervisory conduct constituting quid pro quo and hostile environment sexual harassment:

> In the classic *quid pro quo* case an employer is strictly liable for the conduct of its supervisors, while in the work environment case the plaintiff must prove that higher management knew or should have known of the sexual

16

evidence indicates that, as a first-line supervisor, Gonzales lacked the authority to hire and fire agency employees and could only recommend that employees receive awards or be subject to

---

harassment before the employer may be held liable. The rationale underlying this difference in the treatment of the two cases is easily stated. The environment in which an employee works can be rendered offensive in an equal degree by the acts of supervisors, or even strangers to the workplace. The capacity of any person to create a hostile or offensive environment is not necessarily enhanced or diminished by any degree of authority which the employer confers upon that individual. When a supervisor gratuitously insults an employee, he generally does so for his reasons and by his own means. He thus acts outside the actual or apparent scope of the authority he possesses as a supervisor. His conduct cannot automatically be imputed to the employer any more so than can the conduct of an ordinary employee.

> The typical case of *quid pro quo* sexual harassment is fundamentally different. In such a case, the supervisor relies upon his apparent or actual authority to extort sexual consideration from an employee. Therein lies the *quid pro quo*. In that case the supervisor uses the means furnished to him by the employer to accomplish the prohibited purpose. He acts within the scope of his actual or apparent authority to hire, fire, discipline or promote. Because the supervisor is acting within at least the apparent scope of the authority entrusted to him by the employer when he makes employment decisions, his conduct can fairly be imputed to the source of his authority.

*Id.* at 910 (citations, internal quotation marks, and footnotes omitted). However, Pfau has relied both on appeal and at the district court level almost exclusively on cases addressing the issue of agency, and thus the applicability of strict employer liability, in the context of hostile environment claims and does not contend that Gonzales may be an agent of the DCAA for purposes of her quid pro quo claim but not for purposes of her hostile environment claim. We decline to raise this issue on our own motion, and decide the case based on the arguments advanced by the parties. *See In re Quenzer,* 19 F.3d 163, 165 (5th Cir.1993) ("Typically, we will not consider on appeal matters not presented to the trial court."). Because we conclude that Gonzales was not the DCAA's agent with respect to Pfau's hostile environment claim, we also conclude that he was not an agent for purposes of her quid pro quo claim.

17

disciplinary action.  Gonzales could also issue assignments to auditors and determine the number of hours allocated to each assignment.  The case law in this circuit indicates that this degree of authority is, as a matter of law, insufficient to establish that a supervisor is an agent within the meaning of Title VII.

In *Garcia v. Elf Atochem N.A.,* 28 F.3d 446 (5th Cir.1994), this court concluded that immediate supervisors may be agents of employers within the meaning of Title VII's definition of employer when they are " "delegated the employer's traditional rights, such as hiring and firing.' "  *Id.* at 451 (quoting *Quijano v. University Fed. Credit Union,* 617 F.2d 129, 131 (5th Cir.1980)).  While the court acknowledged that the phrase "any agent" in Title VII's definition of employer was entitled to a liberal construction, it declined to extend the definition "to include all supervisory personnel, not just those with the ability to hire and fire." *Garcia,* 28 F.3d at 451.

We recognize that some authority exists for the proposition that a supervisor need not have the authority to hire and fire in order to be considered an agent of the employer for Title VII purposes.  *See Canutillo Indep. Sch. Dist. v. Leija,* 101 F.3d 393, 397 (5th Cir.1996) ("[T]he Fourth Circuit has explained, "[The agent] need not have ultimate authority to hire and fire to qualify as an employer, as long as he or she has significant input into such personnel decisions.' " (quoting *Paroline v. Unisys Corp.,* 879 F.2d 100, 104 (4th Cir.1989), *vacated in part on other grounds,* 900

18

F.2d 27 (4th Cir.1990) (en banc))), *cert. denied,* --- U.S. ----, 117 S.Ct. 2434, 138 L.Ed.2d 195 (1997). However, even courts that take this more liberal approach acknowledge that the supervisor must exercise "significant control over the plaintiff's hiring, firing or conditions of employment." *Paroline,* 879 F.2d at 104. The summary judgment evidence in this case indicates that the minimal authority wielded by Gonzales falls short of such significant control.[6] We therefore conclude that the district court did not err in ruling as a matter of law that Gonzales was not Pfau's employer for purposes of determining the DCAA's liability under Title VII.[7]

---

[6]Pfau makes much of the fact that Gonzales stated in a memorandum to the DCAA regional director that he "was instrumental and mainly responsible for the proper procedural handling of the termination of Ms. Pfau." However, the fact that Gonzales managed the procedural aspects of Pfau's termination in no way indicates that he had significant input in the decision to fire her.

[7]In *Hamilton v. Rodgers,* 791 F.2d 439 (5th Cir.1986), a case not relied upon by Pfau, a panel of this court took an expansive view of the "any agent" provision of Title VII's definition of employer. In that case, the court concluded that fire department supervisors whose authority was limited to tasks such as assigning cars and staffing shifts were employers within the meaning of 42 U.S.C. § 2000e(b). *See id.* at 442. The court reasoned that " "[a] person is an agent under § 2000e(b) if he participated in the decision-making process that forms the basis of the discrimination.' " *Id.* at 443 (quoting *Jones v. Metropolitan Denver Sewage Disposal Dist.,* 537 F.Supp. 966, 970 (D.Colo.1982)).

The court premised its expansive reading of § 2000e(b) on the notion that a narrower reading "would encourage supervisory personnel to believe that they may violate Title VII with impunity." *Id.* This rationale for the court's interpretation of § 2000e(b) presupposes that individual employees such as the supervisors at issue could be held liable in their individual capacities under Title VII. *See Harvey v. Blake,* 913 F.2d 226, 228 n. 2 (5th Cir.1990). Prior to *Hamilton,* a panel of this circuit held that public officials could not be held liable in their individual capacities under Title

19

b. *The DCAA's Knowledge and Remedial Action*

Pfau argues in the alternative that a genuine issue of material fact exists as to whether the DCAA knew or should have known of Gonzales's harassment of Pfau and other DCAA employees and failed to take prompt remedial action. She advances two theories in support of this proposition: (1) the DCAA had actual knowledge of Gonzales's harassment of her and failed to take prompt remedial action, and (2) sexual harassment by Gonzales and other officials was so pervasive, open, and obvious that the DCAA had constructive notice of Gonzales's harassment of her and failed to take prompt remedial action. The summary judgment evidence that Pfau has submitted fails to create a genuine issue of material fact as to either of these theories.

Pfau contends that the DCAA had actual notice that Gonzales had harassed her and other DCAA employees prior to December 9, 1992, the date on which she first complained to upper management that Gonzales had sexually harassed her. She contends that, on April 16, 1992, she wrote a letter to Martin Munoz, the former Central Region EEO officer for the DCAA's office in Irving, Texas, complaining of sexual harassment. However, the letter contains no reference to sexual harassment by Gonzales, and only complains of

_____

VII. *See Clanton v. Orleans Parish Sch. Bd.,* 649 F.2d 1084, 1099–100 (5th Cir. Unit A July 1981). Thus, to the extent that *Hamilton* 's broad reading of § 2000e(b) is premised upon a legal conclusion that would effectively overrule a prior panel opinion, we do not feel constrained to apply it in this case. *See Ryals v. Estelle,* 661 F.2d 904, 906 (5th Cir. Nov.1981) ("It has long been a rule of this court that no panel of this circuit can overrule a decision previously made by another.").

conduct of female co-workers.

Pfau also claims that a September 12, 1992 memorandum that she sent to Dale Collins, the DCAA's Director of Personnel, establishes that the DCAA had knowledge of her harassment by Gonzales prior to December of 1992. The memorandum states generally that "[t]he responsibility of management to prevent sexual harassment is not being performed." However, it contains no allegations of sexual harassment on the part of Gonzales, and actually urges that Gonzales "should be given fair treatment." The memorandum therefore provided the DCAA with no notice that Gonzales had sexually harassed Pfau.

Finally, Pfau contends that Gonzales harassed two other DCAA employees—Tonya Scherchyl Martinez and Carolyn Pease—in 1990 and 1991 and that she reported these instances of supposed harassment to management. However, Pfau has offered no deposition testimony or affidavits from these other employees establishing that they experienced sexual harassment. Rather, she simply states in her own affidavit that these other employees told her that Gonzales had harassed them. This portion of Pfau's affidavit is incompetent summary judgment evidence because it consists of inadmissible hearsay. *See Barhan v. Ry-Ron Inc.,* 121 F.3d 198, 202 (5th Cir.1997).

The competent summary judgment evidence that speaks directly to the DCAA's knowledge of Gonzales's alleged sexual harassment is limited to the affidavits of Michael Gonzales, the DCAA's Central Region EEO officer in Irving, Texas; James C. Bourne, Regional

21

Audit Manager of the DCAA's Central Division; Harold J. Lamb, the former Branch Manager of the DCAA's Austin, Texas office; and Dennis Low, a supervisory auditor at the DCAA's Austin office. In each affidavit, the affiant states that he had no knowledge of any allegations of sexual harassment by Gonzales prior to Pfau's complaint in December 1992. Thus, no genuine issue of material fact exists as to whether the DCAA had actual knowledge of sexually harassing conduct on the part of Gonzales prior to December 9, 1992.

Likewise, no genuine issue of material fact exists as to whether DCAA management should have known of such conduct prior to December 1992 based on the pervasiveness of sexual harassment within the agency. Pfau has not produced summary judgment evidence indicating that Gonzales's alleged sexual harassment was so pervasive that the DCAA should have known about it as it was happening. Pfau's affidavit indicates that much of Gonzales's alleged sexually harassing behavior took place outside the office (e.g., telephone calls at home and visits to her apartment). Pfau alleges that, on "many" occasions during working hours, Gonzales would stand very near her and that he "continuously pressured" her during working hours to take him on vacation. Pfau also states in her affidavit that on one occasion Gonzales called her into his office and requested that they have lunch at her apartment, a comment that she interpreted to be a request for sexual relations. Pfau also mentions a few other specific instances of sexually harassing conduct in Gonzales's office. She alleges that, on one

22

occasion, he told her that her blouse was unbuttoned when it was not and that, on another, he told her to turn around so that he could see her backside. She also states that, on another occasion, Gonzales requested that Pfau stand very near him in his office and became angry when she would not move closer.

Pfau has also offered the affidavit of Mary Lou Kirschbaum, a former supervisory auditor in the DCAA's Austin office. In her affidavit, Kirschbaum states that on one occasion Gonzales sent a message to her during a business meeting requesting that she call him at his hotel and that on another occasion he requested that she call him at the home of the DCAA's Central Regional Director. She also claims that she accompanied Gonzales to dinner at an expensive restaurant and that he expected her to pay the bill. She indicates that Gonzales "brought up this incident in front of Dennis Low, who was then the special assistant to the Branch Manager of the DCAA Austin office," and that she was embarrassed by this.[8]

Kirschbaum also states that she heard Gonzales make "sexual jokes, comments, and innuendos during work hours" and that he would make "unwelcome sexual contact" with her and other female employees. Kirschbaum provides no description of the "sexual contact" to which she refers, nor any basis for her conclusion that

---

[8]We question whether the above events described by Kirschbaum in any sense constitute hostile environment sexual harassment. Gonzales's requests for telephone calls and expectation that Kirschbaum pick up an expensive dinner tab, while perhaps inconsiderate, are not the sort of "severe or pervasive" conduct that would " "alter the conditions of [Kirschbaum's] employment and create an abusive working environment.' " *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405 (internal quotation marks omitted).

23

the purported contact with other employees was unwelcome or sexual.

The above allegations of specific instances of Gonzales's sexually harassing conduct, while perhaps establishing a fact issue as to whether he created a hostile work environment for Pfau, do not create a genuine issue of material fact as to whether Gonzales's harassment was so open and obvious that the DCAA should be charged with constructive notice of it.[9]  This conclusion is bolstered by the fact that much of the alleged conduct took place outside the working environment and the affidavits offered by Pfau contain little indication that any substantial portion of the alleged sexual harassment took place in the presence of other employees.[10]

---

[9]In many cases the affidavits of Pfau and Kirschbaum simply state that the specific events that they describe occurred "before December 9, 1992" or "before Marie Pfau filed her formal sexual harassment complaint against Pete Gonzales" and provide no indication of how far in advance of Pfau's formal complaint the alleged conduct occurred.  Thus, even if we were to conclude that a reasonable jury could find that the pervasiveness of Gonzales's alleged harassment provided the DCAA with constructive notice of it, Pfau has failed to create a fact issue as to the timeliness of the DCAA's response because she has provided no indication of how much time elapsed between the point of constructive notice and the DCAA's response.

[10]Pfau also argues that numerous other male supervisors at the DCAA also engaged in sexual harassment.  She contends that the pervasiveness of sexual harassment by these other employees provided the DCAA with constructive notice that sexual harassment was occurring within the organization.  However, Pfau's complaint is limited to allegations that *Gonzales* sexually harassed her. Accordingly, Pfau's complaint seeks recovery only for Gonzales's hostile environment and quid pro quo sexual harassment. We fail to see how harassment by other supervisors, regardless of how pervasive, could have provided the DCAA with constructive notice that Gonzales had been engaged in harassment.

Authority exists for the proposition that, when harassment is sufficiently pervasive, an employer may be

24

We find further support for our conclusion that no genuine issue of material fact exists as to whether the DCAA had constructive notice of Gonzales's harassment of Pfau in the fact that the summary judgment evidence indicates that the DCAA had a structured, accessible grievance procedure that Pfau could (and ultimately did) use to provide the DCAA with actual notice of her harassment. In *Meritor,* the Supreme Court rejected the defendant employer's argument "that the mere existence of a grievance procedure and a policy against discrimination, coupled with the [plaintiff's] failure to invoke the procedure, must insulate [the defendant] from liability." *Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408. However, the court went on to point out that the defendant's nondiscrimination policy and grievance procedure suffered from two distinct infirmities: (1) the nondiscrimination policy "did not address sexual harassment in particular, and thus did not alert employees of their employer's interest in correcting that form of discrimination;" and (2) the grievance procedure would have

---

liable on the basis of constructive knowledge. *See, e.g., Waltman v. International Paper Co.,* 875 F.2d 468, 478 (5th Cir.1989). However, in the cases that have held employers liable on the basis that the pervasiveness of sexual harassment implies constructive knowledge, the pervasive conduct *is the conduct of which the plaintiff complains. See id.* (concluding that sexually explicit graffiti and multiple instances of unwanted physical contact that formed the basis of plaintiff's claim of hostile environment sexual harassment were also sufficiently pervasive to create a fact issue as to whether employer had constructive notice of harassment). In this case, Pfau has sought recovery only for the hostile environment created by Gonzales and Gonzales's quid pro quo sexual harassment. She does not seek recovery for hostile environment or quid pro quo sexual harassment by other supervisors. Accordingly, the pervasiveness of harassment by other supervisors cannot logically form a basis for holding the DCAA liable.

25

required the plaintiff to report her harassment to her supervisor—the very person who had been sexually harassing her. *See id.* at 72-73, 106 S.Ct. at 2408-09. The court observed that, in the absence of these infirmities, the defendant's argument that the presence of these policies should insulate it from a finding of constructive notice "might be substantially stronger." *See id.* at 73, 106 S.Ct. at 2408.

The summary judgment evidence in this case indicates that (1) the DCAA had a specific policy against sexual harassment and provided sexual harassment training to employees and (2) the DCAA's grievance procedure did not require Pfau to report her harassment to Gonzales. As such, the DCAA's "procedures were better calculated to encourage victims of harassment to come forward" than the procedures at issue in *Meritor. Id.* We express no opinion as to whether the DCAA's grievance procedure and sexual harassment policy may of themselves bar a finding of constructive notice. However, the presence of these procedures, coupled with the sparse summary judgment evidence indicating that Gonzales's harassment of DCAA employees was open and pervasive, warrant our conclusion that no genuine issue of material fact exists as to whether the DCAA had constructive notice that Gonzales was harassing Pfau prior to her complaint in December 1992.

Pfau likewise has failed to raise a genuine issue of material fact as to the adequacy of the DCAA's remedial response once it had notice of Gonzales's alleged sexual harassment. In her affidavit, Pfau conclusorily states that the EEO counselors who investigated

26

her formal complaint attempted to "whitewash" her complaint and that she "believed that the investigators and counselors ... had little interest in getting at the truth." Such conclusory and speculative assertions are not competent summary judgment evidence. *See Lechuga v. Southern Pac. Transp. Co.,* 949 F.2d 790, 798 (5th Cir.1992) ("Conclusory statements in an affidavit do not provide facts that will counter summary judgment evidence, and testimony based on conjecture alone is insufficient to raise an issue to defeat summary judgment." (footnote omitted)).

The summary judgment evidence indicates that upon receiving Pfau's formal complaint, the DCAA's EEO department began a prompt investigation. Paula A. McFarland, an EEO counselor for the DCAA, met with Gonzales. Her report on Pfau's complaint states that she spoke with Gonzales about sexual harassment training and complaint procedure and instructed him not to call Pfau at home. Harold Lamb, the DCAA Austin Branch Manager, states in his affidavit that he met with Gonzales and instructed him not to call DCAA employees after hours. He also states that he "reminded [Gonzales] about the DCAA policy prohibiting sexual harassment and admonished him to not engage in any activity which might in any way be considered unwelcome sexual harassment." This remedial response passes muster under Title VII. *See Waymire v. Harris County,* 86 F.3d 424, 429 (5th Cir.1996) (holding reprimand of employee who had engaged in sexual harassment sufficient as a matter of law where employee had no prior documented offenses); *Landgraf v. USI Film Products,* 968 F.2d 427, 430 (5th Cir.1992) ("Title VII does not require that an

27

employer use the most serious sanction available to punish an offender, particularly where, as here, this was the first documented offense by an individual employee."), *aff'd,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

Moreover, Pfau essentially admitted in deposition that Gonzales engaged in no more sexually harassing conduct after she made her formal complaint.[11]  McFarland's investigative report states that "Ms. Pfau stated that the comments and telephone calls had stopped and that I should just write in the EEO's counselor's report that the problem was resolved."  The summary judgment evidence thus indicates that no genuine issue of material fact exists as to whether the DCAA's remedial efforts were sufficient to avoid liability under Title VII.

Because no genuine issue of material fact exists with respect to either of the theories advanced by Pfau in support of imposing liability on the DCAA for Gonzales's alleged quid pro quo and hostile environment sexual harassment, the district court properly entered summary judgment in favor of the DCAA on Pfau's sexual harassment claims.

---

[11]Pfau contends that Gonzales made one more harassing statement to her in July of 1993 when she took a business trip to Corpus Christi.  In deposition, she made the following statement:

> He told me that if I ever needed him I could call him and where was the location of my hotel room.  And I thought that a pretty dangerous bunch of words for this guy to use.

However, Pfau admitted in deposition that she believed that this statement merely "bordered on harassment."  It certainly does not create a fact issue as to the effectiveness of the DCAA's remedial response.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.