August 12, 1998

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

No. 96-21110

———————————

LINDA WILLIAMSON,

Plaintiff-Appellee,

versus

THE CITY OF HOUSTON, TEXAS,

Defendant-Appellant.

———————————————————————————

Appeal from the United States District Court for the
Southern District of Texas

———————————————————————————

July 22, 1998

Before WIENER, EMILIO M. GARZA, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

Linda Williamson sued the City of Houston under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, for hostile work environment sexual harassment and for retaliation against her for reporting the harassment. A jury found the City liable for both sexual harassment and retaliation and awarded Williamson back pay and compensatory damages. In addition, the district court awarded her costs and attorney's fees. On appeal the City challenges the judgment on the ground that it did not have notice of the harassment until April 1992, when it took prompt remedial action. In particular, the City claims that any notice to Williamson's supervisor should not be imputed to the City. The City also contends that the evidence was not legally sufficient to support the jury's findings. For the reasons set forth below, we AFFIRM the district court's judgment.

1

## BACKGROUND

Linda Williamson began working as a police officer in the Houston Police Department ("HPD") in 1983. In November 1990, Williamson was assigned to the Organized Crime Squad where she worked in the same squad room as Officer Doug McLeod, with whom she was sometimes partnered. Williamson alleges that for the following eighteen months McLeod harassed her on a daily basis. She presented evidence at trial that McLeod regularly engaged in behavior that created a hostile work environment, including: conducting obvious and demeaning inspections of her appearance, making comments on how her body looked in different clothes, on the appearance of her buttocks, and on the size of her breasts; wedging himself into the cubicle beside her and touching her body, pulling her hair, leaning over her, breathing heavily into her ear, and sticking his tongue in her ear; bumping, tapping, and slapping her; whistling and purring at her; and trying to look up her skirts and down her necklines.

Williamson testified that she repeatedly, but to no avail, told McLeod that his conduct was offensive and demanded that he stop bothering her. She also offered evidence that she repeatedly complained about the behavior to her and McLeod's supervisor, Sergeant James Michael Bozeman. Although these complaints were frequently made in the form of informal comments in the squad room, Williamson testified that she had approximately ten or twelve meetings with Bozeman in his office, during which she specifically requested that she not have to work with McLeod, that she not have to share a vehicle with him, and that she be allowed to switch where she sat in the squad room so as to avoid being near him. With one exception, she found Bozeman wholly unresponsive to her complaints. At one point, apparently in response to her complaints, Bozeman assigned Williamson to work temporarily with another officer. According to Williamson, McLeod continued to harass her in the squad room during that period, but the arrangement was an improvement in that she was able to spend time out of the office without him. After two months, over Williamson's objections, Bozeman reassigned her to work with McLeod.

At the end of April 1992, Williamson went to Bozeman and requested a transfer out of the

2

Criminal Division because of her problems with McLeod. It was at this time that Williamson first used the term "sexual harassment" to describe McLeod's behavior. Bozeman directed Williamson to write down her complaint and take it to the Internal Affairs Division ("IAD"), which she did. McLeod was transferred out of the Criminal Division immediately following Williamson's complaint to IAD.

During the course of the IAD investigation, Williamson filed a statement with IAD alleging that Bozeman had retaliated against her for filing her harassment complaint. Williamson was then reassigned from the Organized Crime Squad to the Research and Analysis Squad.

Williamson presented evidence at trial that, in retaliation for having filed her harassment complaint: Bozeman criticized and taunted her; she was shunned by co-workers; she was transferred to a less desirable position in which she lost opportunities to make overtime pay; and that, as a result of a complaint filed by McLeod's wife, she was given a written reprimand which prevented her from transferring back to the Organized Crime Squad.

The IAD investigation of Williamson's sexual harassment claim found her charges "not sustained," but issued McLeod a written reprimand for having waved a rubber snake at Williamson. No disciplinary action was taken against Bozeman.

During the IAD investigation, Williamson filed a claim with the EEOC, which led to this suit. Williamson's case was heard by a jury in July 1996. At the end of a seven-day trial, the jury found the City liable under Title VII for hostile work environment sexual harassment and for retaliation against Williamson, awarding her $28,000 in back pay and $100,000 in compensatory damages; the district court also awarded her $182,794 in attorney's fees and $17,823 in costs and expenses. The City moved for a directed verdict at the close of plaintiff's testimony and at the close of all evidence; those motions were denied. After the district court entered judgment on the jury's verdict, the City moved for judgment as a matter of law; that motion was also denied. The City then timely filed a notice of appeal.

## DISCUSSION

**I.**

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). It is well known that a plaintiff can establish a violation of Title VII by proving that sexual harassment created a hostile or abusive work environment. *See Meritor Sav. Bank, FSB v. Vinson,* 106 S. Ct. 2399 (1986).

The City first challenges the judgment against it on the ground that the requisite notice element of Williamson's harassment claim was not met. A claim of hostile work environment sexual harassment under Title VII must be supported by proof "that the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Jones v. Flagship Int'l*, 793 F.2d 714, 720 (5th Cir. 1986) (citation omitted); *see also Faragher v. City of Boca Raton,* No. 97-282, 1998 U.S. LEXIS 4216, at *46-47 (U.S. 1998) (noting that the circuits have uniformly applied a negligence standard to Title VII cases involving harassment by co-workers). Either actual or constructive notice is sufficient for liability, and constructive notice can result from "showing the pervasiveness of the harassment." *Waltman v. International Paper*, 875 F.2d 468, 478 (5th Cir. 1989) (quotation marks and citations omitted).

The City argues that as a matter of law it did not have notice that Williamson was being harassed until April 1992 when she filed her formal IAD complaint, and that it took prompt remedial action at that time. Williamson does not dispute that the City took prompt remedial action after she filed her complaint with IAD, but asserts that both the complaints she made to Bozeman, and his direct observation of McLeod's behavior over the eighteen months that Williamson and McLeod worked together under Bozeman's supervision, provided notice of the harassment to the City well before she went to IAD. In support of its position that it did not have notice that Williamson was being harassed prior to April 1992, the City asserts both that Bozeman was not aware of any harassment and, in the alternative, that, because Bozeman was not higher management, his knowledge

4

should not be imputed to the City.

The first of the City's contentions is easily dismissed. The jury found that Bozeman had notice of the harassment, and it is well established that we must accept a jury's factual finding if it is supported by substantial evidence. *See Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir. 1969) (en banc). Here, we have no doubt that there was substantial evidence to support a finding that Bozeman had notice. Williamson testified that she discussed McLeod's harassing behavior with Bozeman on numerous occasions and that Bozeman had observed it himself. Although the City claims that that testimony was contradicted by Bozeman's denial that he had notice, the jury was free to believe her account over his. Moreover, Williamson presented testimony from her co-workers that supports her claim that Bozeman was aware, or should have been aware, of the harassment.

The City's second claim--that as a matter of law Bozeman's knowledge should not have been imputed to the City--poses a more significant question concerning the limits of potential liability under Title VII. This court has noted that "the type and extent of notice necessary to impose liability on an employer under Title VII are the subject of some uncertainty." *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 807 (5th Cir. 1996) (citing *Waltman*, 875 F.2d at 478).

The City relies heavily on cases in which employers were not held liable when supervisors engaged in harassing behavior to argue that notice to Bozeman, a first-line supervisor, is insufficient to constitute notice to the HPD. The City reasons that a harasser necessarily has notice of the harassment and concludes that "[t]he employer should not be any more culpable for the supervisor's knowledge than it is when the supervisor is the harasser." The City's position is clearly undermined by the Supreme Court's recent decisions in *Faragher,* 1998 U.S. LEXIS 4216, and *Burlington Indus., Inc. v. Ellerth,* No. 97-569, 1998 U.S. Lexis 4217 (U.S. 1998), which held that employers are vicariously liable for the harassing behavior of their supervisory personnel. Moreover, regardless of these recent developments, the City's greater-includes-the-lesser argument is inapposite to determining liability here. Determining whether a supervisor was in a position to accept notice of

5

harassment for purposes of liability under Title VII entails a different inquiry than that involved in determining an employer's liability for harassment by supervisors. As a number of courts have pointed out, employer liability for harassment by co-workers is direct liability for negligently allowing harassment, not vicarious liability for the harassing actions of employees. *See Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 804 n.11 (6th Cir. 1994) ("The term 'respondeat superior'--which connotes derivative liability--is an incorrect label for co-worker harassment cases, where the employer is directly liable for its own negligence.") (citation omitted); *Hunter v. Allis-Chalmers Corp., Engine Div.,* 797 F.2d 1417, 1422 (7th Cir. 1986); *cf. Pfau v. Reed,* 125 F.3d 927, 934 n.3 (5th Cir. 1997) (noting that the term "respondeat superior" has been used loosely in Title VII cases). The question before us is whether Bozeman's knowledge of McLeod's harassment of Williamson should be imputed to the City for purposes of holding that it knew or should have known of the harassment and therefore can be held liable for negligently failing to take prompt remedial action. Although, as noted, this area of law has not yet been fully developed, we believe the facts here present a situation in which liability is clearly appropriate.

The City points to testimony that the term "upper management" was reserved for those above the rank of sergeant in the HPD. While information regarding an employer's organizational structure may be relevant to determining whether notice to an employee at a given level constitutes notice to the employer, we agree with the Seventh Circuit that the issue does not turn on labels attached to levels of hierarchy. *See Young v. Bayer Corp.*, 123 F.3d 672, 673-75 (7th Cir. 1997). Some language in our case law has suggested that a more important consideration is whether notice was given "to those with authority to address the problem." *Nash v. Electrospace Sys., Inc.,* 9 F.3d 401, 404 (5th Cir. 1993). Although Bozeman did not have the power to make decisions regarding firing or promoting McLeod, he did have some authority to address the harassment problem. Bozeman was McLeod's supervisor in an organization with a strong chain of command; he could have directed McLeod to cease his harassing behaviors, and McLeod would have been subject to discipline for failing to obey. Moreover, as the City itself points out, if Bozeman failed to report harassment of

6

which he was aware to his superiors, he was breaching an affirmative duty of his position under the HPD's General Orders. The City is hard pressed to explain why Bozeman's knowledge of harassment should not be imputed to the City when its own policy placed an affirmative duty on him to pass such information up the chain of command.[1]

The conclusion that the City can be held liable on the basis of Bozeman's knowledge is put beyond doubt by the HPD's sexual harassment policy, which specifically directs those who believe they have been harassed to report it to their supervisors. The policy states, in relevant part:

> Ideally, any employee who believes that he or she has been the object of sexual harassment should ask the offender to stop using the offensive behavior. If such action does not cause the behavior to stop, then the employee should report the alleged act immediately to his/her supervisor. Supervisors, in consultation with the city of Houston's director of Affirmative Action, should make every effort to ensure that complaints of sexual harassment are resolved promptly and effectively.

> If the employee is not satisfied with the action taken by the supervisor or feels that the complaint would not be received objectively by that supervisor, the employee should bring the complaint to the attention of the Director of Affirmative Action. The complaint will be investigated and the employee will be advised of the findings and conclusion.

Houston Police Department General Order No. 300-11 (December 3, 1987).

When an organization designates a particular person or persons to receive harassment complaints, it sends a clear signal that those persons have the authority to accept notice of harassment problems. In *Faragher* and *Ellerth,* the Supreme Court emphasized that the primary objective of Title VII is to prevent discrimination from occurring, *see Faragher,* 1998 U.S. LEXIS at \*56-57, and that the statute "is designed to encourage the creation of antiharassment policies and effective grievance mechanisms," *Ellerth,* 1998 U.S. Lexis at \*40. To allow employers to escape liability when, as here, the complainant has followed the employer's policy for reporting harassment would

---

[1] The City argues that if Bozeman was aware that McLeod was harassing Williamson and failed to report the harassment, then Bozeman breached his duties under Department policy. According to the City, this means that Bozeman was acting outside the scope of his authority, and consequently HPD cannot be liable based on notice to him. The City misstates the relevant agency principle. An employer is not insulated from liability simply because an agent fails to perform as he or she is supposed to. If the HPD policy gave Bozeman the authority to accept harassment complaints, his knowledge can be imputed to the HPD for purposes of liability whether he exercised that authority appropriately or not.

7

undermine these goals.[2]

------

[2] We note that the City cites *Canutillo Independent School District v. Leija,* 101 F.3d 393 (5th Cir. 1996), for the proposition that notice cannot necessarily be imputed to an organization simply because the complainant followed a procedure recommended in the organization's harassment policy. In *Leija,* we held that a school district was not liable under Title IX for harassment of a student by a teacher where the only notice was to another teacher. We find *Leija* uninstructive here for a number of reasons. First, *Leija* can be distinguished from the case at hand because the person notified in *Leija* was a peer of the harasser who had no authority over him at all. The *Leija* Court explicitly found it unnecessary to consider what level of management must receive notice because the notified person was not management of any level. *See id.* at 401. In other words, in *Leija,* there was no reason to believe that the person notified could address the harassment problem, while here it is undisputed that Bozeman was McLeod's supervisor and therefore had at least some measure of authority over him.

Second, in *Leija,* it is unclear exactly what the policy or policies that were available to students and parents said. *Compare id.* at 402 ("the CISD student handbook designated the *assistant superintendent*, not Mendoza [the teacher who was notified], as the CISD Title IX coordinator (and the person to receive student complaints)"), *with id.* at 412 (Dennis, J., dissenting) ("There was evidence that prior to the incidents in question the school district had no policy directing students and parents as to how to make a report of sexual harassment. The Canutillo Elementary Student Handbook directed students or parents who had any complaint to first take it up with the student's primary teacher."). Even the dissent in *Leija*, which favored liability, did so on the ground that the school had failed to comply with its obligation to establish an adequate complaint procedure or, alternatively, that the harassment in question was quid pro quo and the school was therefore strictly liable, *see id.* at 411-13, not on the ground that the complainant had provided notice by following the organization's complaint procedure.

Finally, it is significant that although the *Leija* court considered liability under a Title VII standard, it also considered liability under two other standards (Title VI's intentional discrimination standard and a *respondeat superior* standard), declining to decide which standard was applicable because liability failed under all three. *See id.* at 400-02. Given subsequent case law, it is now clear that the Title VII liability standard is not applicable to Title IX claims involving the harassment of students, and that different concerns arise with respect to determining liability in Title IX and Title VII cases. *See Gebser v. Lago Vista Indep. Sch. Dist.,* No. 96-1866, 1998 WL 323555 (U.S. 1998); *Rosa H. v. San Elizario Indep. Sch. Dist.,* 106 F.3d 648 (5th Cir. 1997). Therefore, in retrospect we can see that the Title VII analysis in *Leija* was not necessary and that that analysis may in fact have been affected by concerns that are not relevant in the context of employment discrimination.

We also note that in *Rosa H.* this circuit held that only the knowledge of employees with the power to directly remedy harassment problems can be imputed to school districts for purposes of notice under Title IX. *See id.* at 660. Although the *Rosa H.* opinion said that the rule it adopted parallels Title VII law, its discussion of Title VII was clearly dicta. Moreover, the *Rosa H.* court repeatedly stressed that the key premise of liability rules for Title IX claims is that liability attaches only where a school district intentionally breaks the contractual-in-nature obligations attached to federal funding--a point that was reinforced by the Supreme Court's decision in *Lago Vista.* Just as we did "not mean that Title IX claims are governed by Title VII law," *see Rosa H.*, 106 F.3d at 660, neither did we mean that Title VII claims are governed by Title IX law. Given the distinctions between the two statutory schemes, we need not construe the rule regarding imputation of knowledge as narrowly here as we did in *Rosa H.*

The City argues, nonetheless, that notice to Bozeman should not be imputed to the City because the HPD policy indicates that if a complaint to a supervisor does not lead to a satisfactory resolution, the employee should go directly to the City's Director of Affirmative Action. We disagree. An employer cannot use its own policies to insulate itself from liability by placing an increased burden on a complainant to provide notice beyond that required by law. *Cf. Young*, 123 F.3d 672 (holding that an employer had notice where complainant notified her department head, one of four options for reporting complaints under the company's policies). If the employer has structured its organization such that a given individual has the authority to accept notice of a harassment problem, then notice to that individual is sufficient to hold the employer liable. Thus, we find that notice to Bozeman can be imputed to the City of Houston for purposes of liability under Title VII.

## II.

In addition to its challenges regarding the issue of notice, the City also argues that it is entitled to judgment as a matter of law because there was not sufficient evidence to support the jury's findings that: Williamson was harassed on the basis of her sex; the harassment affected a term, condition, or privilege of her employment; the City retaliated against Williamson for reporting the harassment; and Williamson lost $28,000 in overtime pay as a consequence of the retaliation. Post-trial motions for judgment as a matter of law are reviewed in the light most favorable to the jury's determinations. Only when "the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable [people] could not arrive at a contrary verdict" is granting judgment as a matter of law proper. *Boeing*, 411 F.2d at 374. We have carefully reviewed the evidence presented at trial and find that it was sufficient to support each of the jury's findings.

AFFIRMED.

9