**Michael Van PFULLMAN, Plaintiff,**

v.

**TEXAS DEPARTMENT OF TRANSPORTATION, Defendant.**

No. A–97–CA–663–SC.

United States District Court, W.D. Texas, Austin Division.

Oct. 16, 1998.

---

M. Cheryl Kirby, Van OS & Vasquez, P.C., Terral J. Smith, Austin, TX, for Plaintiff.

Henry M. de la Garza, Attorney General's Office, Austin, TX, for Defendant.

## MEMORANDUM OPINION

CAPELLE, United States Magistrate Judge.

Before the Court is the above-referenced case, which was tried to the Court on August 24 through August 26, 1998. The parties previously consented to the jurisdiction of the Magistrate Court pursuant to 28 U.S.C. § 636(c).

### I. STANDARD

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Plaintiff, Michael Van Pfullman, brings this case for same-sex harassment and retaliation under Title VII against his employer, the Texas Department of Transportation.

1. *Sexual Harassment (Hostile Work Environment) Standard*

Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult. *Meritor Savings Bank FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). "A plaintiff can establish a violation of Title VII by proving that sexual harassment created a hostile or abusive work environment." *Williamson v. City of Houston, Texas,* 148 F.3d 462, 464 (5th Cir.1998) (citing *Meritor,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49). A hostile environment claim requires the plaintiff to show that his work environment was so pervaded by harassment

as to alter the terms and conditions of his employment. *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2405. In order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 370–371, 126 L.Ed.2d 295 (1993).

In *Harris,* the Supreme Court directed lower courts to determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. at 371. "Title VII does not prohibit 'genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex.'" *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, ——, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998). "A recurring point in these [Supreme Court] opinions is that 'simple teasing,' *id.* 118 S.Ct. at 1003, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton,* 523 U.S. ——, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998). Title VII does not prohibit "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* 118 S.Ct. at 2284. Bothersome attentions or sexual remarks must be "severe or pervasive" to create a hostile work environment. *Ellerth,* —— U.S. at —— – ——, 118 S.Ct. at 2264–65.

■ To establish vicarious liability of an employer in the hostile work environment context, the employee must show not only a hostile environment but that he suffered an "ultimate employment decision," also stated as an "adverse job action." Ultimate employment decisions include hiring, discharging, promoting, compensating, or granting leave. *Webb v. Cardiothoracic Surgery Assocs.,* 139 F.3d 532, 539 (5th Cir.1998); *Messer v. Meno,* 130 F.3d 130, 135 (5th Cir.1997), *cert. filed* No. 98–535 (Sept. 22, 1998). "An ultimate employment decision, in itself or through its direct consequences, must effect a material change in the terms or conditions of employment." *Dupre v. Harris County Hosp. Dist.,* 8 F.Supp.2d 908, 924 (S.D.Tex. 1998).

■ If there is no ultimate employment decision but a hostile environment has been shown, the employer may assert as an affirmative defense that it had an adequate program in place that would have corrected the hostile environment and that the employee unreasonably failed to take advantage of the program. *See Ellerth,* —— U.S. at —— – ——, 118 S.Ct. at 2265–67. Essentially, *Ellerth* holds that an employer is automatically vicariously liable if a plaintiff suffers an adverse employment action by a harassing supervisor, but the employer will be judged on a negligence standard if there was a hostile environment but no adverse employment action occurred. *Id.* 118 S.Ct. at 2270. Obviously, if there is no hostile environment, the employer is not liable.

Subsequent to *Ellerth,* the Fifth Circuit stated "a claim of hostile work environment sexual harassment under Title VII must be supported by proof that the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Williamson,* 148 F.3d at 464.

### 2. *Retaliation Standard*

■ Pfullman also raises a claim of retaliation. To establish a claim for retaliation, Pfullman must prove (1) that he engaged in protected activity, (2) an adverse employment action occurred, and (3) there was a causal connection between the participation in the protected activity (i.e., his complaints of his supervisors' actions) and the adverse employment action. *Messer,* 130 F.3d at 140. The Fifth Circuit has stated "in a claim for retaliation under Title VII, we are concerned only with ultimate employment decisions, including hiring, discharging, promoting, compensating, or granting leave, and not 'every decision made by employers that arguably

might have some tangential effect upon those ultimate decisions.'" *Webb*, 139 F.3d at 540 (citing, *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707–08 (5th Cir.1997)). If an employee suffers no adverse employment action, judgment for the employer is proper. *Messer*, 130 F.3d at 140; *Dollis v. Rubin*, 77 F.3d 777, 781 (5th Cir.1995).

The fact that an employee feels victimized by his supervisors, although deplorable, does not, without more, show a violation of the Title VII. "Title VII does not exist to punish poor management skills; rather it exists to eliminate certain types of bias in the workplace." *Ray v. Tandem*, 63 F.3d 429, 435 n. 19 (5th Cir.1995).

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. This court has jurisdiction over this matter under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–5 et seq.

2. All conditions precedent to jurisdiction under § 706 of Title VII, 42 U.S.C. § 2000e–5(f)(3), have occurred or been complied with.

3. Venue for this action properly lies in the Western District of Texas under 28 U.S.C. § 1391(b) because this claim arose in this judicial district.

4. Plaintiff, Michael Van Pfullman, is a white male who has been employed with Defendant, the Texas Department of Transportation (TxDot), at the Bastrop County Maintenance Office since March of 1994.

5. Prior to his voluntary transfer to the Bastrop TxDot facility, Pfullman was employed by TxDot for fourteen years at the Johnson City TxDot Maintenance Office.

6. TxDot is an "employer" within the meaning of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

7. On November 9, 1994, Plaintiff's second line supervisor, Leland Gebert, a white male, sat on Plaintiff's lap and briefly "rocked around," commenting "that sure feels good right here."

8. This incident occurred around 8:00 a.m., immediately prior to the usual early morning briefing session for the employees at the Bastrop TxDot facility.

9. Pfullman told Gebert to get off him and pushed Gebert off his lap.

10. Gebert did not intend to sexually harass Pfullman but rather believed he was acting in a joking manner ("horseplay"). However, Gebert admitted that such conduct would not have been considered appropriate at the Bastrop County Maintenance Office if directed towards a female employee.

11. All of the male employees of the Bastrop facility observed Gebert's actions. There is no evidence that any female employees were present.

12. Pfullman was teased by his co-workers as a result of Gebert's actions.

13. Although Plaintiff alleges an additional "lap-sitting" incident, the Court finds that this allegation was not supported by the evidence.

14. In early December, 1994, while eating lunch at a local barbecue restaurant, Pfullman's first level supervisor, Dewey Barton, made fellatio insinuations to Pfullman while Pfullman was eating a sausage.

15. Without being aware of it, Pfullman was apparently eating his sausage in a sexually suggestive manner.

16. To show his objection to Barton's words and actions, Pfullman verbally objected and then got up from the table in a disgusted manner and stormed off.

17. Pfullman testified that he felt this was a homosexual advance, but Barton testified that it was "horseplay." Gebert was present during this incident but did not comment at the time on Barton's actions.

18. Although Plaintiff alleges an additional sausage eating incident, the Court finds that there is insufficient evidence to support the allegation.

19. Plaintiff felt humiliated and upset by his supervisors' sexually oriented actions.

20. Plaintiff perceived the actions as homosexually related.

21. At the time, the supervisors perceived the incidents as joking or horseplay.

22. Plaintiff's enjoyment in his work declined as a result of these incidents.

23. Plaintiff's personal life suffered as a result of his perception of the harassment.

24. Pfullman did not complain at that time to any higher level supervisors about the actions of Gebert or Barton.

25. At that time, TxDot harassment regulations directed an aggrieved employee to report harassment to his supervisor.

26. Gebert instructed employees to report harassment to him or Barton.

27. In February, 1995, Pfullman witnessed an incident between Barton and one of Pfullman's co-worker, David Till. In connection with fit-testing hazardous chemical respirators, Barton told Till to "bend over and he would 'fit test' Till right there."

28. Pfullman was offended and viewed this incident as a homosexual advance.

29. Till was also offended by Barton's actions and complained to Gebert, who verbally instructed Barton not to act in such a manner in the future.

30. Till testified that his relationship with Barton and Gebert remained friendly after his complaint about Barton to Gebert and that no further offensive conduct had ever occurred.

31. On February 27, 1995 at about 4:30 p.m., Pfullman complained to Danny Smith (Pfullman's third level supervisor), first about his co-worker's (Ricky Williams) poor job performance and second, about the incidents with Gebert and Barton.

32. At that time, Pfullman indicated he did not want to file a written grievance about the incidents.

33. The conversation between Pfullman and Smith took about one and one-half hours.

34. The next day, Smith reported Pfullman's concerns to Smith's own supervisor, Claude Garrett (Pfullman's fourth level supervisor)

35. On March 3, 1995, Smith spoke to Gebert about Pfullman's allegations.

36. Gebert indicated he was unaware that his actions had bothered Pfullman and that it would not happen again. Gebert then stated he would speak with Pfullman and resolve the issue.

37. Gebert then apologized to Pfullman for his actions.

38. Pfullman later asked for a meeting with his supervisors.

39. In March, 1995, a meeting was set up with Pfullman, Smith, Gebert, and EEO Officer Mike Borden.

40. TxDot's 1995 policy on harassment contained strict ten and thirty day reporting limitations, which were not complied with by Pfullman.[1]

41. For that reason, TxDot did not formally investigate the internal charge of harassment.

42. However, Gebert and Barton were verbally warned not to repeat their actions.

43. No further sexually harassing events are alleged to have occurred after this warning. The sole harassing events are therefore the lap-sitting, the sausage incident, and the comment about "fit-testing" a co-worker.

1. Under *Faragher* and *Ellerth*, these strict time limitations and the direction to report to the immediate supervisor are inadequate. Because there was no hostile environment and no tangible job detriment, TxDot prevails in the current case. However, the Court doubts that the policy would be sufficient under the facts of a different case to support an affirmative defense. The Court urges TxDot to develop a more effective grievance procedure, if it has not yet done so, in light of the two above-referenced cases.

44. Pfullman asked for a transfer back to Johnson City at "top pay." This request was denied.

45. On April 7, 1995, Pfullman filed a charge of discrimination with the Texas Commission on Human Rights and the Equal Employment Opportunity Commission. In his charge, Pfullman recited the lap sitting and sausage incidents as examples of the sexual harassment he had encountered.

46. Pfullman indicated in his charge that to his knowledge, no disciplinary action had been taken against the harassing supervisors.

47. Viewed objectively, the lap-sitting incident with Gebert was crude but did not create a hostile environment.

48. Viewed objectively, the sausage incident with Barton was crude but did not create a hostile environment.

49. Viewed objectively, the "fit-testing" comment was crude but did not create a hostile environment.

50. Even viewed together, the three incidents are insufficient to create an objectively hostile work environment.

51. No other incidents exist which would justify a finding of severe or pervasive conduct sufficient to create a hostile work environment.

52. Pfullman amended his EEOC charges on July 7, 1995 to add claims of retaliation in denial of overtime compensatory pay.

53. Pfullman engaged in protected activity when he complained about sexual harassment.

54. Plaintiff asserts that after he complained, he was denied overtime, demoted from the sign truck to the paving truck, his work was scrutinized more closely, he was criticized, he was ignored, he was denied raises, he received less favorable evaluations, and he was denied the right to transfer to a different office.

55. The TxDot overtime policy was changed state-wide in June of 1995 (during the time about which Pfull-

man complains about losing overtime pay), resulting in less overtime for all TxDot employees who worked short increments over their eight hour shift.

56. Although it resulted in less overtime pay for Pfullman, this change in policy was not in retaliation for Pfullman's charge.

57. Unscheduled overtime was assigned by calling employees on the telephone and asking if they could come in. If no one answered or they were not available, the next person on the list was called.

58. Pfullman was often not available during off-work hours either because he was asleep or because he was not at home.

59. After his complaint, Plaintiff was given the same opportunities for overtime as other Bastrop employees.

60. Although Plaintiff was transferred from the sign truck in August of 1996 to perform other duties, this was not a demotion. Rather, it was an effort to "cross train" all of the Bastrop employees.

61. Even if Pfullman's work was scrutinized more closely after his complaint (a finding not made by the Court) such scrutiny is not a violation of Title VII.

62. Although Gebert and Barton were more careful in their communications with Pfullman after his complaint, they did not retaliate against him in their manner of communication.

63. Pfullman was not retaliated against during the "sunflower seed incident."

64. Although Plaintiff alleges that he was discriminated against by being forced to drive a truck with loose canisters of welding gas, this court finds that based on other evidence, that claim is not credible.

65. Plaintiff was not denied any raises for which he was entitled.

66. Any decrease in evaluations was the result of Pfullman's declining job attitude, not retaliation.

67. Pfullman was not subjected to any treatment that was different from his fellow employees in retaliation for his protected activity.

68. Plaintiff did not have an absolute right to transfer and was not retaliated against in the denial of a transfer.

69. Plaintiff did not suffer any "ultimate employment action" under Title VII.

70. Plaintiff's complaint resulted in the supervisors being immediately instructed not to repeat the harassing actions.

71. These warnings were effective and no further harassment has occurred.

72. As such, Smith's remedial action, though not required in this case, was effective in preventing further harassment (which might have been actionable).

73. Plaintiff is not entitled to any damages in this Title VII action.

### III. CONCLUSION

The Court determines that Judgment should be entered in favor of Defendant Texas Department of Transportation on the grounds recited above. As such, this Court will enter a contemporaneous judgment this date dismissing the case in full.

### FINAL JUDGMENT

The Court entered a Memorandum Opinion in the above-referenced cause this date. In the Memorandum Opinion, the Court determined that judgment would be granted in favor of Defendant. All pending motions are denied as moot and any relief not expressly granted in this judgment or in the Memorandum Opinion is **DENIED.**