

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00523-CV

JERLINE SMITH                                                    APPELLANT

V.

CARTER BLOODCARE                                                 APPELLEE

------------

### FROM THE 67TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Jerline Smith appeals the trial court's grant of summary judgment in favor of Appellee Carter BloodCare (CBC) on her hostile work environment sexual harassment claim. We will affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. BACKGROUND

CBC is a nonprofit blood bank headquartered in Bedford. It collects, stores, processes, and tests blood before distributing it to health care facilities. In 2009, CBC operated approximately twenty donor centers, including the Forest Park location in Fort Worth. CBC divides its organizational hierarchy into seven Levels. Level One, at the very bottom of the organization, includes Phlebotomist Is and Phlebotomist IIs. Level Two, the next highest ranking, includes donor Site Supervisors. CBC has a formal policy prohibiting sexual harassment that requires complaints to be brought to the attention of the Director of Human Resources.

CBC hired Smith in June 2008 as a Phlebotomist I. After completing two months of training, Smith began working full time at the Forest Park center. Her duties included registering donors, screening donors for eligibility, and performing venipuncture. Other CBC employees who worked at the Forest Park center in 2009 included Shadreth Collins, the Site Supervisor; Anthony Alexander, a Phlebotomist II; Sonya Arriaga, a Phlebotomist II; Michelle Murray, a Phlebotomist I; and Brianna Howard, a Phlebotomist I. Collins reported to Operations Coordinator Neil Coady, who reported to Terri DeMartelaere, one of two Managers of Donor Centers and Apheresis. Terrie Henderson was CBC's Director of Human Resources. Coady, DeMartelaere, and Henderson worked at CBC's Bedford headquarters.

2

At some point between January and April 2009, while Smith was at work one day, Alexander picked her up, standing face to face with her, while grabbing her behind. According to Smith, she neither said nor did anything to provoke Alexander's behavior. Smith told Arriaga, Murray, and Howard about the incident, and she told Alexander that his conduct was inappropriate.

Shortly thereafter, sometime in April or May 2009, Smith attended a party at Arriaga's house. When Smith left the party, Alexander, who had also attended the party, reached into Smith's car with his head and kissed her on her lips. Smith described the kiss as a "peck," and she told Arriaga, Murray, and Howard about it.

About five or six months later, in October or November 2009, Alexander asked Smith what sexual positions she liked. Smith told Arriaga that Alexander's comments made her uncomfortable.

On December 9, 2009, Alexander "pecked" Smith on her lips as they were walking to the break room to eat lunch. Smith pushed Alexander away and then ate lunch; they did not sit by each other. Later that day, when Smith and Alexander (and no one else) were closing the center around 6:30 p.m., Alexander grabbed Smith from behind and started kissing her. Alexander grabbed Smith's breasts underneath her bra, put his hand down her pants, and touched her behind. Smith told Arriaga later that night what had happened.

The following morning, December 10, 2009, Arriaga informed Collins that Smith had a problem. Collins found Smith sitting on the floor in an office with her head down and crying, and Smith told Collins what Alexander had done to her the previous day. Smith initially asked Collins not to report the incident because she did not want anyone to get fired, but Collins notified DeMartelaere, who spoke with Smith on the phone. Smith agreed with Collins's suggestion to change Smith's work schedule so that she would never have to work with Alexander alone.

After her discussion with Collins, Smith went to CBC's headquarters to meet with DeMartelaere and Henderson. Henderson questioned Smith about the December 9, 2009 incident with Alexander, but Smith was uncooperative and nonresponsive during the meeting, according to Henderson, and provided only a short written statement. Later that night, Smith advised DeMartelaere that she wanted to pursue her allegations, and a more detailed statement signed by Smith was faxed to Henderson.

In addition to meeting with Smith, CBC interviewed Arriaga, Collins, Howard, and Alexander. Alexander denied Smith's accusations. On December 17, 2009, Smith complained that Alexander had slammed a door in her face. Henderson investigated that allegation and suspended Alexander on December 21, 2009.

4

That same day, Smith met with Henderson, DeMartelaere, and Coady at CBC's headquarters. The parties' versions of events that day conflict, but the record demonstrates that they discussed that Smith had reported the December 9, 2009 incident to police, called Alexander once after the incident, and requested a copy of the investigation file. According to Henderson, Smith was agitated and disrespectful during the meeting, and she was ultimately suspended for three days for insubordination. Smith disagreed that she had been insubordinate.

By December 21 or 22, 2009, CBC had concluded, or had almost concluded, its investigation. Although the investigation was inconclusive, CBC ultimately terminated Alexander's employment on December 24, 2009, in part because he had a prior complaint on his record and because "CBC wasn't willing to risk him being there."

In February 2010, Jose Ortega, a Phlebotomist II, informed Smith that she had mislabeled a tube. Smith disagreed, and Ortega issued her a "Coaching and Counseling" form, which she refused to sign. The next day, DeMartelaere met with Smith, who was argumentative and uncooperative and said things like, "This is silly." DeMartelaere suspended Smith, and CBC ultimately terminated her employment in March 2010.[2]

---

[2]Ortega states in his affidavit that following her meeting with DeMartelaere, Smith said "[f]uck off" as she was walking out the door. Smith claims that she said "Forget y'all."

Smith sued CBC for sexual harassment and retaliation under the Texas Commission of Human Rights Act (TCHRA). *See* Tex. Labor Code Ann. §§ 21.051, 21.055 (West 2006). The trial court granted CBC summary judgment on Smith's sexual harassment claim but denied CBC summary judgment on the retaliation claim. A jury subsequently found that CBC did not retaliate against Smith for filing a sexual harassment complaint or a charge of discrimination. Smith appeals the trial court's summary judgment ruling on the sexual harassment claim, not the jury's finding on the retaliation claim.

### III. SUPERVISOR AND CO-WORKER SEXUAL HARASSMENT

In what we construe as two issues, Smith argues that the trial court improperly granted CBC summary judgment on her hostile work environment sexual harassment claim because her summary judgment evidence raised a genuine issue of material fact (1) that Alexander was her supervisor and (2) that even if Alexander was not her supervisor, CBC was negligent because it (i) knew or should have known of the sexual harassment before December 10, 2009, but failed to take prompt remedial action and (ii) failed to take prompt remedial action after Smith complained about Alexander on December 10, 2009.

### A. Standard of Review

In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.

6

Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort*, 289 S.W.3d at 848. We must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented. *See Wal-Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex. 2006); *City of Keller v. Wilson*, 168 S.W.3d 802, 822–24 (Tex. 2005). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence that raises a fact issue. *Van v. Pena*, 990 S.W.2d 751, 753 (Tex. 1999).

## B. Supervisor/Co-worker Harassment Distinction

An employer's liability for workplace harassment varies depending on the status of the alleged harasser as either a supervisor or a co-worker. *E.E.O.C. v.*

*Boh Bros., Constr. Co.*, 731 F.3d 444, 452 (5th Cir. 2013).[3]  A plaintiff alleging a hostile work environment sexual harassment claim must establish that (1) she belonged to a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action, i.e., the employer was negligent.  *City of San Antonio v. Cancel*, 261 S.W.3d 778, 784 (Tex. App.—Amarillo 2008, pet. denied); *see Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759, 118 S. Ct. 2257, 2267 (1998) ("An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it.").  "Generally, the negligence standard governs employer liability for *co-worker* harassment."  *Sharp v. City of Houston*, 164 F.3d 923, 929 (5th Cir. 1999); *see Williamson v. City of Houston*, 148 F.3d 462, 465 (5th Cir. 1998) ("[E]mployer liability for harassment by co-workers is *direct liability* for negligently allowing harassment." (emphasis added)).

But when the harassment arises from a *supervisor's* conduct, the plaintiff does not have to prove the fifth element—that the employer was negligent; instead, "an employer may be *vicariously* liable for its employees' creation of a hostile work environment."  *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441–42

---

[3]Texas courts may look to analogous federal law when applying the TCHRA.  *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 (Tex. 2010).

(2013). If the supervisor's harassment culminated in a tangible employment action, then the employer is strictly liable. *Id.* at 2442. If the supervisor's harassment did not culminate in a tangible employment action, the employer can be vicariously liable for the supervisor's creation of a hostile work environment if the employer is unable to establish the *Faragher/Ellerth* affirmative defense. *Id.* ("[A]n employer can mitigate or avoid liability by showing (1) that it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided."); *see Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 2292–93 (1998); *Ellerth*, 524 U.S. at 765, 118 S. Ct. at 2270.

Thus, "it is obviously important whether an alleged harasser is a 'supervisor' or merely a co-worker." *Vance*, 133 S. Ct. at 2443.

## C. Supervisor Claim

Smith argues in her first issue that the trial court erred by determining as a matter of law that Alexander was not her supervisor. We must disagree.

The United States Supreme Court recently resolved a circuit split and clarified the proper standard for determining whether an individual is a supervisor for purposes of establishing vicarious liability for an employee's harassment under Title VII. *See id.* at 2443–44. It stated,

> We hold that an employer may be vicariously liable for an employee's unlawful harassment only when the employer has

9

empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."

*Id.* at 2443. The Court specifically rejected the more "nebulous," "open-ended" definition advocated by the EEOC, "which tie[d] supervisor status to the ability to exercise significant direction over another's daily work." *Id.* Unlike that standard, the definition adopted by the Supreme Court, derived from its *Ellerth* and *Faragher* decisions,

presupposes a clear distinction between supervisors and co-workers. . . . There is no hint in [*Ellerth* or *Faragher*] that the Court had in mind two categories of supervisors: first, those who have such authority and, second, those who, although lacking this power, nevertheless have the ability to direct a co-worker's labor to some ill-defined degree. On the contrary, the *Ellerth/Faragher* framework is one under which supervisory status can usually be readily determined . . . .

*Id.* We will use the same standard in the TCHRA context. *See Waffle House, Inc.*, 313 S.W.3d at 804.

Here, Alexander was a Phlebotomist II. Smith was a Phlebotomist I. Both positions are Level One employees under CBC's organizational hierarchy. A Phlebotomist II cannot discipline another employee, including a Phlebotomist I, but a Phlebotomist II can "write up" a Phlebotomist I by completing a "Coaching and Counseling" form, which the Phlebotomist I must sign. The only difference between the two positions is that a Phlebotomist II is able to "run" the donor floor when the Site Supervisor is away from the center.

10

Significantly, a Phlebotomist II does not have the authority to hire, fire, or demote someone. Even when the Site Supervisor is away and a Phlebotomist II is responsible for running the donor floor, a Phlebotomist II does not have the authority to hire, fire, or promote anyone. In fact, even a Site Supervisor— ranked higher on CBC's organizational hierarchy than a Phlebotomist II—lacks the authority to hire, fire, or demote someone. Consequently, a Phlebotomist II, a Phlebotomist II running the donor floor in the absence of the Site Supervisor, or a Site Supervisor does not have the authority to take a tangible employment action against any employee.

Smith argues that Alexander was her supervisor because the December 9, 2009 incident occurred when Collins, the Site Supervisor at CBC's Fort Worth center, was not there; because Arriaga, a Phlebotomist II, was a "supervisor," knew about Alexander's inappropriate conduct, and had a responsibility to report it; and because CBC allowed Ortega, a Phlebotomist II, to direct Smith how to label a tube, to dismiss Smith from work for the day, and to "carry out a suspension for insubordination." However, whether Collins was present or absent when the December 9, 2009 incident occurred is irrelevant for purposes of the analysis because, as explained, under no circumstances does a Phlebotomist II, or a Phlebotomist II running the donor floor, have the authority to take a tangible employment action against anyone. Likewise, neither Arriaga nor Ortega are supervisors as defined by the Supreme Court.

11

Smith argues that Alexander was Smith's supervisor because the job description for a Phlebotomist II states that supervising staff is a major responsibility, but as the Supreme Court explained, the term "supervisor" has varying meanings both in colloquial usage and in the law, and in the absence of any evidence demonstrating that Alexander had the power to exercise supervisory authority as defined in *Vance*, we disagree that an undefined, vague reference contained in an employee's job description is some evidence that can fill that vacuum. *See Vance*, 133 S. Ct. at 2448 ("[T]he authority to take tangible employment actions is the defining characteristic of a supervisor.").

We hold that the trial court did not err by granting CBC summary judgment on Smith's claim that Alexander was her supervisor. We overrule Smith's first issue.

### D.    Co-worker Claim

Smith argues in her second issue that even if Alexander was not her supervisor, but was instead her co-worker, the trial court erred by granting CBC summary judgment. Smith's second issue implicates the fifth element that a plaintiff must establish when alleging a co-worker harassment claim—that the employer knew or should have known of the harassment and failed to take prompt remedial action. *See Cancel*, 261 S.W.3d at 784.

### 1. CBC's Knowledge of Harassment Before December 2009

Smith contends in the first part of her second issue that her summary judgment evidence raised a genuine issue of material fact that CBC knew or should have known of Alexander's sexually harassing behavior before December 10, 2009.

While actual knowledge is established by proof that management knew of the harassment, constructive knowledge is established when the harassment was so severe and pervasive that management reasonably should have known of it. *See Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 802 (8th Cir. 2009). Indeed, to establish that the employer knew or should have known of the co-worker harassment, the plaintiff need not necessarily have reported it to a supervisor; where harassment is pervasive, knowledge may be imputed to the employer. *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 276 (6th Cir. 2009); *see Ford v. West*, 222 F.3d 767, 776 (10th Cir. 2000) (reasoning that only when the acts of harassment are so egregious, numerous, and concentrated as to add up to a campaign of harassment will the employer be liable for failure to discover the harassment).

Smith begins her argument with the following recitation about her summary judgment evidence:

> Alexander made sexual comments and flirtatious come-ons to the female employees on the donor floor in front of everyone. The sexual comments from Alexander were described as "nasty" and were made in such a manner that they were "open and obvious" to

13

everyone on the floor at the Forest Park location of Carter BloodCare. These types of comments were made continuously to all of the co-workers. [Record citations omitted.]

Smith also details the following summary judgment evidence at the outset of her brief:

Prior to the sexual harassment of Ms. Smith, Alexander sexually harassed an employee named Nila. This harassment was reported to HR and nothing was done about the harassment. Alexander also sexually harassed Phlebotomist I Michelle Murray. Alexander made inappropriate comments to Murray such as "damn, those jeans look good on you." Alexander kissed Murray on her neck one time before December 2009, which was not welcomed by Murray. To Murray, this was not horseplay, but was rather serious harassment. [Record citations omitted.]

All of this evidence is relevant to whether CBC knew or should have known of Alexander's sexually harassing behavior before December 10, 2009, but we cannot consider any of it because CBC objected to it, the trial court sustained CBC's objections in their entirety, and Smith does not challenge the trial court's ruling on appeal. *See Little v. Needham*, 236 S.W.3d 328, 331 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (reasoning similarly); *Seaway Prods. Pipeline Co. v. Hanley*, 153 S.W.3d 643, 650 (Tex. App.—Fort Worth 2004, no pet.) (reasoning similarly). Accordingly, our analysis excludes any reliance on that summary judgment evidence.

Three incidents involving Alexander and Smith occurred before December 2009: (1) Alexander picked Smith up while they were at work, (2) Alexander kissed, or "pecked," Smith on her lips when they were leaving a party at Arriaga's

14

house, and (3) Alexander asked Smith what sexual positions she liked. Regarding the severity of the incidents, two involved physical contact, one did not involve physical contact, and Alexander's conduct in all three incidents was significantly less aggressive than his actions in December 2009. Regarding the frequency of the harassment, the picking-up incident occurred at some point between January and April 2009, the kiss at the party occurred in April or May 2009, and the question about sexual positions occurred in October or November 2009, about six months later. Thus, there were three incidents over the course of eleven months, and while the first and second incidents occurred in close proximity, there was a lengthy gap between the second and third incidents. Regarding the status of those involved, Alexander was Smith's co-worker, not her supervisor. As for whether Alexander engaged in any similar conduct with other people at the center, there is no evidence that he did so (disregarding the excluded evidence above), but there is evidence that he had a prior complaint against him in which he made a comment about a pregnant co-worker's body or that involved a female employee sitting on his lap. Although we cannot consider the excluded evidence, we can consider Henderson's testimony that Arriaga had told her that Alexander "makes a lot of comments like, Oh, dang, I know why your husband does not let you out of the house."

There is evidence that Smith informed other people about the incidents. Smith argues (1) that she told Collins, Arriaga, Murray, and Howard of the Spring

15

2009 incident in which Alexander picked her up; (2) that she told Arriaga, Murray, and Howard about Alexander kissing her at Arriaga's party in April 2009; and (3) that she complained to Arriaga that Alexander had asked her what sexual positions she liked. Smith additionally contends that because Arriaga, a "supervisor," knew about Alexander's inappropriate conduct and had the responsibility to report it, CBC had notice "through its supervisor" of Alexander's harassment.

As for notice to Collins of the picking-up incident, Henderson testified in her deposition that Collins was an appropriate person to report the harassment to, but Smith did not argue in her summary judgment response that she told Collins that Alexander had picked her up, and the summary judgment evidence that Smith directs us to on appeal does not indicate that she told Collins about the incident. The evidence instead demonstrates that Collins did not know about any harassing conduct committed by Alexander against Smith before December 10, 2009.[4]

---

[4]Collins testified in her deposition,

I talked to her [Smith] and asked her why she did not -- you know, she didn't tell me that. If there was a problem -- because from my understanding, it had been going on, but I had no clue. And she would always be there working with Anthony afterhours. Well, I didn't have a clue that anything was going on. And I told her when I talked to her in my office that, you know, if there was a problem, you should have been here and you should have let me know a long time ago because we would have fixed this a long time ago if it was a problem.

Regarding Smith's notice to Arriaga of the three incidents, Arriaga was a Phlebotomist II, but as explained above, there is little difference between a Phlebotomist I and a Phlebotomist II, and Arriaga was not a supervisor as that term is defined for purposes of establishing vicarious liability, nor was Arriaga a person that CBC had designated to receive complaints about harassment. Henderson opined that Arriaga had a responsibility to report to management any harassing conduct that she knew of, but there is no evidence that Arriaga reported any of the three incidents to Collins, a supervisor, or Henderson, CBC's Director of Human Resources. To the contrary, Arriaga did not believe that the pre-December 2009 incidents were severe, agreeing in her deposition that she followed the chain of command once Smith brought to her attention "a serious problem," i.e., when Smith told her about the December 9, 2009 incident.

Regarding Smith's notice to Murray and Howard of two of the three pre-December 2009 incidents, both Murray and Howard were Phlebotomist Is like Smith, and there is no evidence that either of them ever informed Collins or a supervisor about the incidents.

Accordingly, although there certainly is some evidence of sexually harassing behavior and some evidence that Smith told a number of co-workers about it, in light of all of the above, and not considering the evidence excluded by the trial court, we cannot conclude that Smith's evidence raised a genuine issue of material fact that Alexander's harassing conduct was so pervasive that CBC

17

knew or should have known about the harassment before December 2009. *See*

*Sandoval*, 578 F.3d at 802. We overrule this part of Smith's second issue.

### 2. Prompt Remedial Action Upon Notice on December 10, 2009

Smith argues in the second part of her second issue that she raised a genuine issue of material fact that CBC failed to take prompt remedial action once she complained about Alexander on December 10, 2009. She contends that CBC did nothing "remedial" and made her continue to work with Alexander for a week after the December 9, 2009 incident.

Prompt remedial action must be reasonably calculated to end the harassment. *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 329 (5th Cir. 2004). What constitutes prompt remedial action depends on the facts of the case; an employer may be liable despite having taken remedial steps if the plaintiff can establish that the employer's response was not reasonably calculated to halt the harassment. *Id.*

When Smith told Collins about the December 9, 2009 incident, she also said that she did not want anyone to get fired and that she would be okay working with Alexander, but not working with him alone. Between Smith's reporting the December 9 incident and Alexander's termination on December 24, 2009, Smith worked with Alexander for a total of four-and-a-half days, and at no point during that period did she work with him alone. CBC immediately began an investigation into Smith's allegations, interviewing multiple employees, including

18

Alexander, and there is no evidence that Alexander committed any acts of harassment towards Smith after December 9, 2009. Alexander slammed a door on Smith on December 17, 2009, but CBC suspended him and fired him shortly thereafter.

We hold that Smith's summary judgment evidence failed to raise a genuine issue of material fact that CBC failed to take prompt remedial action once it learned of the December 9, 2009 incident involving Alexander. We overrule the remainder of Smith's second issue.

## IV. CONCLUSION

Having overruled all of Smith's issues, we affirm the trial court's grant of summary judgment in favor of CBC on Smith's sexual harassment claim.

/s/ Bill Meier

BILL MEIER
JUSTICE

PANEL: GARDNER, WALKER, and MEIER, JJ.

DELIVERED: March 27, 2014